UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES FIRE INSURANCE CO., | Case No. 1:15-cv-46 |
| Plaintiff/Crossclaim Plaintiff | Beckwith, J.<br>Bowman, M.J. |
| v. | |
| WATERFRONT ASSOCIATES, INC., | |
| Defendant/Third-Party Plaintiff, | |
| v. | |
| C&B MARINE, LLC, | |
| Third-Party Defendant/Crossclaim Defendant | |

## REPORT AND RECOMMENDATION

Third-Party Defendant C&B Marine, LLC ("C&B") has filed a motion to compel arbitration and to stay all other proceedings in this declaratory judgment action. Both Plaintiff United States Fire Insurance Co. ("U.S. Fire") and Defendant Waterfront Associates, Inc. ("Waterfront") have filed responses in opposition to C&B's motion, and C&B has filed a reply. The motion has been referred to the undersigned for initial review. I now recommend that the motion be DENIED.

**I. Background**

A barge that once operated on the Ohio River as a well-known floating restaurant called the Waterfront (hereinafter "Barge") sunk in August 2015, and was declared a total loss. Several calamities befell the ill-fated Barge prior to its last day afloat. Which

of these events proved to be fatal, and who was responsible for the sinking, forms the basis for this litigation.

All parties agree that the first misadventure occurred on March 11, 2011. Unfortunately for the restaurant patrons inside at the time, the Barge broke away from its moorings in Covington, Kentucky. Immediately following that calamity, the restaurant closed.

In September 2011, Waterfront sought and obtained insurance on the Barge from U.S. Fire. The insurance policy ("Policy") was renewed in 2013, with an effective date through October 1, 2014. (Doc. 1 at ¶12; Doc. 9 at ¶12).

On or about February 6, 2014, a second misfortune occurred when the Barge again broke away from its moorings. After that, Waterfront hired C&B to move the Barge from Covington, Kentucky to Hebron, Kentucky to C&B's facility. (Doc. 35 at ¶10-12). Waterfront alleges in its third-party complaint that while still under the care, custody and control of C&B, on June 26, 2014, a third calamity occurred when the Barge was struck by another barge, identified as Barge AEP 2015 ("Allision"). (Doc. 1 at ¶27; Doc. 9 at ¶17; Doc. 35 at ¶17).

Waterfront alleges that on or about August 4, 2014, C&B repositioned the Barge, which resulted in the Barge being moved to shallower water. (Doc. 35 at ¶¶21-22). Waterfront alleges that during that move, the Barge suffered one last misfortune, when it struck a submerged hazard that damaged its hull. (*Id.* at ¶24). Just prior to the repositioning by C&B, Waterfront alleges that C&B disconnected the power to the Barge's pumps and did not reconnect that power supply. (*Id.* at ¶23).

2

Waterfront reported to its insurer, U.S. Fire, that on August 5, 2014, the Barge sank while at its normal mooring in expectable conditions. (Doc. 9 at ¶29; Doc. 35 at ¶29). Waterfront now alleges that C&B is liable for the loss. Waterfront alleges that the sinking of the Barge was caused by C&B disconnecting power to the pumps on board, and/or because the Barge struck a submerged hazard. (Doc. 35 at ¶¶28-32).

Soon after the Barge sank, on October 9, 2014, Waterfront entered into a new contract with C&B to remove the wrecked Barge (the "Wreck Removal Contract"). The Wreck Removal Contract required Waterfront to pay C&B the sum of $500,000.00 to remove and dispose of the sunken vessel.

Waterfront sought to recover under the U.S. Fire Policy for the cost of raising the Barge and for the total loss of or damage to the hull of the Barge. Waterfront requested that its insurer make an advance payment to C&B for its services to raise the Barge. U.S. Fire agreed, advancing "Waterfront's contract payment to C&B," and paying C&B $500,000.00 on Waterfront's behalf. However, U.S. Fire made the payment subject to a reservation of its rights concerning questions of coverage under the Policy. (Doc. 1 at ¶¶33-38; Doc. 9, ¶¶33-38).

In January 2015, U.S. Fire initiated this lawsuit against Waterfront, alleging that when it purchased the Policy, Waterfront failed to disclose or misrepresented "the full condition" of the vessel - namely, that "it was in a state of advanced deterioration and wastage and was not in a serviceable or …seaworthy condition." (Doc. 1 at ¶¶16-17). U.S. Fire further alleges that Waterfront misrepresented its intentions to reopen the Barge as an operating restaurant. (Doc. 1 at ¶¶`19-20). Presenting fourteen claims,

3

U.S. Fire's complaint seeks a declaratory judgment to declare the Policy to be void *ab initio*, or alternatively, to declare that there is no coverage for the Barge under the Policy, and ordering Waterfront to repay to U.S. Fire the sum previously advanced under the Policy ($500,000.00) plus interest, costs, and attorney's fees. (Doc. 1, PageID 13).

Waterfront filed an Answer and Counterclaim. The Counterclaim alleges that U.S. Fire breached its contract of insurance to pay the full value of the Barge, plus pre- and post-judgment interest. Waterfront further alleges bad faith by U.S. Fire in "its delay and ultimate refusal to pay its obligations and in attempting to void the policies." (Doc. 9 at ¶20). Waterfront seeks a judgment against U.S. Fire "in the amount of Waterfront's actual losses and attorney's fees and expenses and punitive damages in the amount of $3,400,000." (*Id.*, PageID 75).

The Court issued a Scheduling Order on April 24, 2015 and an Amended Calendar Order on November 1, 2015, that required the parties to disclose fact witnesses by November 16, 2015 and expert witnesses by February 1, 2016, with a final discovery deadline of April 15, 2016. (Docs. 20, 22).

Near the close of discovery, on March 18, 2016, Waterfront filed its third party complaint against C&B, alleging that C&B's negligence caused the sinking of the Barge. (Doc. 35). On May 6, 2016, U.S. Fire filed a cross-claim against C&B, contingent upon U.S. Fire being subrogated to Waterfront for the claimed loss of the Barge. U.S. Fire argues that if C&B is responsible for the sinking of the Barge, then C&B should be held

4

liable to U.S. Fire for the $500,000 in Policy proceeds that U.S. Fire previously advanced to C&B. (Doc. 39).

In response, C&B has filed a motion to stay proceedings and to compel arbitration pursuant to an arbitration clause in the October 2014 Wreck Removal Contract between Waterfront and C&B.

## II. Defendant's Motion to Compel Arbitration/ Dismiss

The Federal Arbitration Act reflects a strong federal policy in favor of arbitration, and explicitly provides that:

> A written provision in any…contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction…shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. §2.

Despite the strong federal policy reflected in the statute, this Court retains jurisdiction to determine the validity of the contractual arbitration clause that C&B invokes in this case. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404-05 (1967) (holding that courts have jurisdiction under the FAA to determine the contractual enforceability of an arbitration clause). When considering whether to grant a motion to compel arbitration, district courts are called upon to make several threshold determinations, including whether the parties agreed to arbitrate and whether the scope of the arbitration agreement encompasses the parties' dispute. *See Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000).

5

"In examining a motion to compel arbitration, 'courts treat the facts as they would in ruling on a summary judgment motion, construing all facts and reasonable inferences that can be drawn therefrom in a light most favorable to the non-moving party.'" *Ackison Surveying, LLC v. Focus Fiber Solutions, LLC*, Case NO. 2:15-cv-2044, 2016 WL 4208145 (S.D. Ohio Aug. 10, 2016) (holding that disputed fact as to whether contract existed to arbitrate required denial of motion to compel arbitration) (additional internal citations omitted).

### A. The Existence of an Arbitration Agreement

Under the October 9, 2014 Wreck Removal Contract executed between Waterfront and C&B, Waterfront agreed to pay the sum of $500,000.00 to C&B to "[r]emove and dispose of barge and restaurant," (Doc. 41-1, PageID 197). The Wreck Removal Contract includes an arbitration clause, which C&B argues mandates arbitration in this litigation.

Waterfront and U.S. Fire readily deny the existence of any <u>applicable</u> arbitration agreement. None of the parties suggest that the underlying Policy between Waterfront and U.S. Fire, or any other contractual agreement in force between C&B and Waterfront prior to the execution of the Wreck Removal Contract contained an arbitration agreement.

The parties also do not dispute that Paragraph 18.2 of the Wreck Removal Contract provides, in relevant part: "Any dispute arising out of <u>this Agreement</u> shall be referred to Arbitration…." (Doc. 41-1, PageID 200, emphasis added). A Rider on the

6

back of the Wreck Removal Contract contains five paragraphs alphabetically designated as A-E, of which only Paragraphs A and C are relevant to the pending dispute.

Paragraph A specifies that any arbitration is to take place in New York, and provides details of how the panel of arbitrators is to be selected and the law to be applied. Paragraph C of the Rider to the Wreck Removal Contract states:

> C) This Agreement shall not affect the parties' respective rights to other claims each might have against the other, including, but not limited to, claims associated with the sinking of the vessel and nothing herein shall be construed as a waiver of such rights.

(Doc. 41-1, PageID 201). The remaining three paragraphs of the Rider, designated as Paragraphs B, D, and E, do not appear relevant to the arbitration clause or to the underlying dispute presented in this case.[1]

### B. The Scope of the Arbitration Agreement

Having confirmed the existence of an arbitration agreement in the Wreck Removal Contract between C&B and Waterfront, the Court is next called to determine whether it applies to the claims at issue. As described above, the parties' underlying dispute concerns the liability for the sinking of the Barge, and whether or not the Policy should be enforced. Depending upon the cause of the sinking (including whether Waterfront misrepresented the condition of the Barge), Waterfront may be responsible for repaying the $500,000.00 previously advanced by U.S. Fire under the Policy. Alternatively, U.S. Fire may be held responsible to pay out additional insurance

---

[1] Of the three remaining paragraphs in the Rider, Paragraph B and E require C&B to accept the transfer of title and ownership of the Barge, and to include Waterfront in C&B's insurance coverage relating to the Barge removal. Paragraph D arguably is the most important, at least to the extent that it is bolded and capitalized to set it apart. Paragraph D contains C&B's agreement to permit Waterfront and U.S. Fire "**A REASONABLE OPPORTUNITY …TO INSPECT THE HULL MINUS ITS SUPERSTRUCTURE PRIOR TO THE HULL'S REMOVAL AND DEMOLITION**." (Doc. 41-1, PageID 201).

proceeds under the Policy. All of the events on which the parties' respective claims are based, relating to representations made about the Barge and the causal events that led to its sinking, occurred between March 11, 2011 and August 5, 2014, long before C&B and Waterfront entered into the Wreck Removal Contract.

The undersigned finds persuasive the arguments by Waterfront and U.S. Fire that the Wreck Removal Contract, including but not limited to the arbitration clause, cannot be applied retroactively to reach back and require arbitration of claims that arose prior to the formation of that Agreement. In addition to the timing of the events and the explicit language of the Wreck Removal Contract limiting its terms to disputes "arising out of this Agreement," the non-waiver clause set forth in Paragraph C of the Rider further confirms the parties' clear intent to exclude pre-existing claims "associated with the sinking of the vessel" from all provisions of the Wreck Removal Contract.[2]

To support its expansive reading of the contract containing the arbitration clause, C&B cites the strong presumption under federal law of resolving any doubts concerning the scope of arbitrable issues in favor of arbitration. In so doing, C&B ignores basic principles of contract law. "[A]rbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration." *Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005) (internal additional quotation marks and citation omitted); *see also NCR Corp. v. Korala Associates Ltd.*, 512 F.3d 807, 813 (6th Cir. 2008) (holding that lower court erred in applying a broad standard that clause requiring arbitration for "any controversy or claim

---

[2]C&B admits that "Waterfront's suspicions [about C&B's liability for the sinking] explain the purpose of Section C of [the] Rider." (Doc. 47, PageID 224).

8

arising out of or relating to this contract" applied to encompass all claims that merely "touch[ed] upon matters" covered by the contract).

The clear and unambiguous language of the October 9, 2014 Wreck Removal Contract provides for arbitration <u>only</u> for issues "arising out of" the Wreck Removal Contract, which itself is limited in scope to the "remov[al] and dispos[al]" of the Barge. Paragraph C of the Rider underscores the same point by restating that the Agreement does not pertain to any issues that relate to the sinking of the Barge or claims that pre-existed the Wreck Removal Contract.

The case of *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 130 S. Ct. 2847 (2010) illustrates the point that a pre-existing claim cannot "arise under" a later-executed contract containing an arbitration clause. There, an arbitration clause was included in a Collective Bargaining Agreement ("CBA"). The CBA also contained a "no-strike" provision. The unions had begun striking in July 2004, and the parties disputed whether the CBA (with its arbitration clause) applied. A threshold issue concerned when the CBA was ratified. Reiterating the bedrock principle that "[a]rbitration is strictly 'a matter of consent,'" the Supreme Court held that "courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor*…its enforceability or applicability to the dispute is in issue." *Id.* at 2857-2858. The Court explained that if "as [the Union] asserts, the CBA containing the parties' arbitration clause was not ratified, and thus not formed, until August 22, there was no CBA for the July no-strike dispute to "arise under," and thus no

9

valid basis for the Court of Appeals' conclusion that Granite Rock's July 9 claims arose under the CBA and were thus arbitrable…." *Id.* at 2861.

So too in the case presented, the critical facts that form the basis of this dispute occurred well before the formation of the Wreck Removal Contract. The arbitration clause applies only to issues "arising under" that Contract, which was limited to the removal and disposal of the submerged vessel. Because the Wreck Removal Contract containing the arbitration clause did not exist until October 9, 2014, it is impossible for the underlying disputes over the sinking of the Barge or applicability of the U.S. Fire Policy to have "arisen under" that Agreement.

C&B makes two countervailing arguments, neither of which is persuasive. First, C&B argues that the underlying dispute cannot be resolved without "reference to" the Wreck Removal Contract, because U.S. Fire alleges in its original complaint, and Waterfront admits in its answer, that U.S. Fire "agreed to advance Waterfront's contract payment to C&B" in the amount of $500,000.00, as an advance under the Policy to pay for the removal of the Barge. (Doc. 1 at ¶ 36; Doc. 9 at ¶ 36). Several courts, including the Sixth Circuit, have offered the following short-hand method of determining the scope of an arbitration clause contained in a contract: "A proper method of analysis here is to ask if an action could be maintained without reference to the contract…at issue. If it could, it is likely outside the scope of the arbitration agreement." *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 395 (6th Cir. 2003) (additional citation omitted). Assuming the converse as an immutable truth – that if the pleadings reference the contract, it is within

10

the scope of the arbitration agreement - C&B argues that the reference to the Wreck Removal Contract brings the underlying action within that Contract.

In the same vein, C&B argues that the damages sought from C&B, repayment of the $500,000.00 paid to C&B on Waterfront's behalf, even more directly arise from the Wreck Removal Contract. Because Waterfront and/or U.S. Fire both seek to recover the same sum, C&B contends that the dispute "arises under" the Wreck Removal Contract.

Waterfront does not dispute that if it can prove that C&B negligently caused the Barge to sink, then Waterfront "would be entitled to recover that $500,000 from C&B Marine <u>as damages for the sinking</u>…." (Doc. 45, PageID 212, emphasis added). U.S. Fire also concedes that its contingent cross-claims seek recovery of the Policy advancement of $500,000 paid for removal of the Barge. However, neither Waterfront nor U.S. Fire agree that the fact that the damages sought from C&B align with the amount paid under the Wreck Removal Contract converts the underlying insurance coverage dispute over the sinking of the Barge, or the related negligence claim against C&B, into a dispute arising under that Contract. The undersigned agrees.

If C&B had sued Waterfront for failure to timely pay C&B for removing and disposing of the Barge under the Wreck Removal Contract, or conversely, if Waterfront had filed suit against C&B for failure to remove and dispose of the Barge, such claims naturally would "arise under" the Contract and be arbitrable. But a claim that damages are owed based upon C&B's alleged negligence prior to the formation of the Wreck Removal Contract is entirely different. As U.S. Fire points out, the costs of removal and

11

disposal of the Barge are simply part of the damages Waterfront claims to have incurred as a result of the sinking of the Barge, and are specifically imposed on a vessel owner under the federal Wreck Removal Statute. *See* 33 U.S.C. § 409. The Supreme Court has made clear that an arbitration clause should be liberally interpreted only after first determining that the contract that contains that clause applies to the underlying dispute. When a contract limits itself to disputes "arising under this Agreement" and was formed long after the underlying dispute, the contract has no applicability to the unrelated and pre-existing dispute. *See Granite Rock Co. v. Int'l Brotherhood of Teamsters*, *supra*.

C&B's reliance on the short-hand "reference to the contract" method of analysis cited with approval in *Fazio* assumes too much. Following *Fazio*, the Sixth Circuit clarified that a brief reference to a contract containing an arbitration clause does not necessarily mean that the underlying dispute must be arbitrated.

> [A] claim that is truly outside of an arbitration agreement…cannot be forced into arbitration, even though there may be factual allegations in common. In particular, the determination that a claim 'require[s] reference' to an arbitrable issue of factual dispute is not determinative.

*Simon*, 398 F.3d at 776 (citing *Bratt Enters., Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 613 (6th Cir. 2003)). Thus, the fact that U.S. Fire and Waterfront's claims share "factual underpinnings" to the wholly different type of claims that would require arbitration under the Wreck Removal Contract does not mean that the litigated claims must themselves be arbitrated. *Id.* at 776 ("The question of whether or not Simon's ERISA claims share facts with the arbitrable claims is not necessarily determinative of arbitrability of the ERISA claims").

12

In *Alticor, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 411 F.3d 669 (6th Cir. 2005), the Sixth Circuit upheld the denial of a motion to compel arbitration, where the arbitration clause was not included in the insurance policy that was the basis for the underlying dispute, but instead was contained in an ancillary Premium Payment Agreement that compelled arbitration only for disputes "arising out of or relating to" that separate contract. The insurer had argued that because Alticor was refusing to pay its alleged deductible under National's interpretation of the underlying policy, that Alticor simultaneously was violating the Premium Payment Agreement, such that the dispute fell within the arbitration clause. However, the Sixth Circuit held that "Alticor's requirement under the Premium Payment Agreement to make payments to National Union does not convert the determination of the amount of such reimbursement – an issue arising under the insurance policy – into a dispute relating to or arising under the Premium Payment Agreement." *Id.* at 672. The appellate court's explanation resonates here: "Although this arbitration provision may appear broad because of its coverage of 'all' disputes 'relating to' the Premium Payment Agreement, it also is narrow because of its limitation to that Agreement and its failure even to refer to the insurance policy." *Id*. "[T]he arbitration provision is limited to 'disputes or differences arising out of or relating to' the Premium Payment Agreement, and the dispute between the parties relates not to that agreement, but to the insurance policy." *Id.* at 673.

Having determined that the Wreck Removal Contract has no application at all to the claims herein, it is unnecessary to reach C&B's additional argument concerning the meaning of Paragraph C. However, to the extent considered, the undersigned rejects

13

C&B's strained interpretation that Paragraph C of the Wreck Removal Contract does not preserve the parties' rights to file suit for any claims "**in court**," but rather, merely "preserve[s] the right to bring certain claims against C&B, but not exclude them from arbitration." (Doc. 47, PageID 224, emphasis original).

Under C&B's interpretation, there would be no basis to include Paragraph C, whether or not related to claims over the sinking of the Barge. Yet even C&B admits that Paragraph C was added to confirm the limited scope of the Wreck Removal Agreement, not to expand it, based upon Waterfront's belief at the time that C&B might bear some responsibility for the sinking of the Barge. (See Doc. 47, PageID 223, citing evidentiary exhibits). "The Clause [Paragraph C] exists solely because Waterfront hired C&B to scrap the Barge, even though Waterfront wrongfully suspected that C&B could have been responsible for the Barge's sinking." (Doc. 47, PageID 226).

### III. Conclusion and Recommendation

Having concluded that all of the claims that Plaintiff seeks to litigate are outside the scope of the arbitration clause contained in the Wreck Removal Contract, the undersigned finds no basis either to compel arbitration, or to stay any of the claims at issue in this litigation. Accordingly, **IT IS RECOMMENDED THAT** C&B's motion to compel arbitration and to dismiss this case (Doc. 41) be **DENIED**.

*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES FIRE INSURANCE CO., | Case No. 1:15-cv-46 |
|     Plaintiff/Crossclaim Plaintiff | Beckwith, J. |
| | Bowman, M.J. |
|   v. | |
| WATERFRONT ASSOCIATES, INC., | |
|     Defendant/Third-Party Plaintiff, | |
|   v. | |
| C&B MARINE, LLC, | |
|     Third-Party Defendant/Crossclaim Defendant | |

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

15